Filed 8/25/15  In re Adrian R. and Julian R. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re ADRIAN R. and JULIAN R., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B258439 (Super. Ct. No. J-1300275, J-1300276) (Santa Barbara County) |
| CHILD PROTECTIVE SERVICES,   Petitioner and Respondent, v. NICOLE C.,   Defendant and Appellant. | |

Nicole C. (Mother) appeals the order of the juvenile court terminating her parental rights to her biological sons, Adrian R., born in October 2007, and Julian R., born in March 2009.  (Welf. & Inst. Code, § 366.26.)[1]  Adrian and Julian appeal from the same order.  Appellants contend the juvenile court erred when it found the "beneficial parental relationship" exception did not apply.  (§ 366.26, subd. (c)(1)(B)(i).)   We affirm.

*Facts*

Mother's biological children include Adrian, Julian and Zachary, who was born in 1999, when Mother was about 15 years old.  Zachary has very significant

---

[1] All statutory references are to the Welfare & Institutions Code unless otherwise stated.

1

behavioral problems and is currently placed in long term foster care at a group home. Adrian was initially diagnosed with autism. Both Adrian and Julian also had a number of developmental and behavioral difficulties, including delayed speech.

In October 2011, Mother and all three children were living in Santa Barbara with Frank R. (Father), the biological father of Adrian and Julian. Respondent received many referrals concerning domestic violence and general neglect of the younger boys. Mother and Father agreed to participate in a voluntary family maintenance program with respondent. The voluntary program ended, and a formal dependency proceeding began, in November 2011, because Mother and Father were not accessing the counseling and other services made available to them and concerns persisted about neglect of the younger children. Adrian and Julian remained in their parents' custody, however, until late August 2012.

In the November 7, 2011 dependency petition, a child welfare worker described Mother as "stressed out and overwhelmed by [Child Welfare Services] appointments and financial problems and calls [Father] at work constantly complaining that the kids are out of control. She tells the kids to get away from her and that she doesn't want them near her and then goes on Face book [sic] or the telephone. [Mother] will leave the home two or three times per month and will be gone for days at a time. The mother has major mood swings all the time and says that she doesn't want to be a stay at home mom anymore."[2]

The juvenile court accepted jurisdiction over Adrian and Julian, ordering in-home placement with formal supervision. Mother's initial case plan required her to participate in drug and alcohol assessments and a psychological evaluation and then follow any resulting treatment recommendations. The written case plan also required Mother to refrain from participating in domestic violence and verbal abuse, and to participate in both couples counseling and in-home parenting services as recommended.

---

[2] We have taken judicial notice of the record filed in a prior related writ matter, *N.C. v. Superior Court, County of Santa Barbara,* 2d Juv. No. B254790.

At the six-month review hearing in June 2012, Mother and Father had broken up, the family had been evicted from their apartment, and Mother was living with the children in a shelter while waiting for housing in a shelter for families with special needs children. Mother had refrained from domestic violence but failed to comply with other aspects of her case plan. While she had attended some individual counseling, she did not complete the psychiatric evaluation. She had completed a substance abuse assessment but had not participated in the recommended treatment. Mother participated in some of the recommended services for the children, but did not obtain speech therapy for Julian.

Respondent filed a supplemental petition (§ 387) in August 2012 because neither parent was complying with their case plan or making progress in finding stable housing for the children. Respondent had asked both parents to complete certain tasks, to help determine where the children should live after the parents' separation. Neither parent completed any of the tasks. In addition, Mother had not enrolled the children in speech therapy or begun the intensive in-home parenting program recommended for her. She sporadically attended counseling and continued to engage in verbal abuse with Father, in the presence of the children. Respondent described Mother as "stressed out and overwhelmed by CWS appointments. [Mother] has major mood swings that impair her ability to be attentive to her children and their special needs. [She] places blame for the families problems on [her eldest child, then in foster care] and on CWS. She accepts no responsibility and has stated the presence of CWS is not needed or wanted."

The accompanying detention report further noted Mother's ability to care for the children had been deteriorating, as witnessed by staff at the family's shelter, the child welfare worker and the children's CASA volunteers. Mother appeared to be stressed and disengaged from the children. Staff at the shelter reported Mother "has been seen sitting with her head on the floor while the children run around an climb on tables." Mother refused to attend a meeting with the child welfare worker who then traveled to the shelter, to detain the children on an emergency basis. During the detention process, Mother sobbed loudly, told the children they were being taken away because she was not

a good mother, and refused to help pack their belongings.  Even though she was asked about the children's medical needs, Mother failed to inform the child welfare worker that Julian was prone to febrile seizures.  Julian had a seizure the next day.

Adrian and Julian were detained in foster care, placed in a group home for a period of time, and were eventually placed with their paternal grandparents, who live in Santa Barbara.  In an October 2012 jurisdiction and disposition report, respondent noted, "[Mother] stated on August 31, 2012, that she is looking at the detention as a much needed respite that will provide her with the time to finish school and her externship and to get a job and housing. On September 20, 2012, [Mother] stated she is tired of CWS making it hard for her.  She continues to state that doing a substance abuse program is unnecessary and will prevent her from getting a job."  Mother reported that she had postpartum depression after each pregnancy and was hospitalized after Julian's birth because she was having suicidal thoughts.  Mother also reported a history of depression, anxiety and panic attacks.  The juvenile court continued Adrian and Julian's placement in foster care and ordered continued reunification services for Mother.

At the next six-month review hearing, in April 2013, respondent reported that Mother was stilling struggling to comply with her case plan.  She had briefly entered and then been discharged from a substance abuse program because of her poor attitude and noncompliance.  About one month before the review hearing, Mother was readmitted to the program.  She was living with an aunt, trying to find housing through a homeless prevention program and had acquired a part time job.  At the same time, Mother continued to believe "she is being victimized by the CWS process.  She is also defiant and difficult to work with."  She blamed Father for her continued stress and complained about the children not following directions.  Fifteen months after being ordered to do so, Mother finally completed a psychological evaluation.  The evaluator concluded: "[Mother] presents with a range of mental health issues that limit her ability to be present emotionally for her children."  Mother failed to participate in recommended treatment and refused medication.

During this period, Mother had weekly visitation with the children at a

4

group visitation site. She visited once in December, twice in January and once in March. She was offered one additional visit per week, but attended these visits only three times. The quality of these visits was "fair. She has been observed to not initiate contact or show affection and at times has not brought food and or toys."

By the time of the next review hearing, in November 2013, Mother was working part time and had been living with a cousin. Mother completed an outpatient drug treatment program in May 2013 and had been regularly participating in individual therapy with a counselor.

Meanwhile, the children's behavior had greatly improved under the structure and routine imposed by the paternal grandparents. They were not fighting as frequently or having as many tantrums as they had in prior placements. Mother had unsupervised visits with the children three times per week. In September 2013, she began having weekly overnight visits on Saturdays. Mother reported to the case worker that she was having trouble getting the boys to listen to her. On one visit, Mother called the paternal grandparents for help because she was having a hard time getting the boys to leave a birthday party. The grandparents reported that, when the boys returned from visits, they would tell Mother "to shut up" or say no to her. They sometimes needed to be reminded to say good bye to their mother. The paternal grandmother also reported that the children enjoyed their first overnight visit with Mother and wanted to do it again. The juvenile court terminated reunification services for Father, but continued services for Mother for another six months.

During the next review period, Mother found a part time job and shared housing. She briefly reunited with Father, but the couple broke up again within a few weeks. In February 2014, Mother's visits were extended from Friday night through Sunday afternoon because she had acceptable housing. In December and January, Mother missed three visits because she was out of town visiting Zachary, was sick or was moving into the new apartment. The therapist working with Mother on her parenting reported that Mother had mastered the first part of their curriculum, relating to interaction with the child, and was "entering the parent-directed phase of therapy in which they will

5

be working on direct commands plus behavior strategies helpful to get children to comply." According to the therapist, "Julian enjoys being with [Mother] and [Mother] is very attentive and tries to make sure when he is picked up that he is fed before therapy." The paternal grandparents reported that Mother had fewer negative interactions with them during this reporting period. Mother attended some individual therapy appointments but would not consider taking medication.

Adrian and Julian continued to do well in their grandparents' home. Adrian was reassessed and found to no longer meet the criteria for autism. Both children had speech deficits and were difficult to understand. In other respects, they displayed age appropriate behaviors. Adrian sometimes had tantrums and was defiant after visits with Mother. Julian also had tantrums and would scream when not getting his way. Julian needed oral surgery for abscesses on his molars, which required court approval for general anesthesia. The child welfare worker told Mother to get a letter from the dentist so the court could approve the surgery; she delayed getting the letter for several weeks. Ultimately, the paternal grandmother called the dentist and obtained the letter that same day.

The child welfare worker concluded that, while Mother had made "some progress on her case plan," she continued to maintain an "acrimonious" relationship with Father and had sporadic attendance at therapy. She had only recently secured employment and suitable housing, and was therefore not able to demonstrate her ability to provide for the children's needs on a daily basis. The boys had "high levels needs that require a significant level of attention, supervision, and parenting skills." Their behavior had vastly improved in their current placement with the paternal grandparents. Respondent recommended that Mother's reunification services be terminated and that the matter be set for a permanency planning hearing.

At the 18-month review hearing on March 6, 2014, the juvenile court accepted respondent's recommendation, terminated reunification services for Mother and set the matter for a permanency planning hearing. Mother filed a notice of intent to file a

6

petition for extraordinary writ review, but never filed the petition itself.  (Cal. Rules of Court, rule 8.450.)  We dismissed the matter as abandoned.

In June 2014, counsel for Adrian and Julian filed a request to change the March 6, 2014 order (§ 388).  Counsel requested that Mother's parental rights be preserved and that guardianship be selected as the boys' permanent plan.   Counsel represented that Adrian's CASA volunteer opposed termination of parental rights because both children had bonded with Mother and would feel a sense of abandonment if their connection to Mother was severed.

The CASA volunteer's report echoed this concern.  She worried the paternal grandparents would prevent the boys from seeing Mother after an adoption.  After the order terminating reunification services, the boys went from weekly overnight visits with Mother to about 12 hours of visitation over three months.  The CASA volunteer believed the grandparents had given Adrian stability and routine that allowed his speech, behavior and social skills to improve "tremendously[.]"  She also believed "it is equally or more important for Adrian to know and experience the love his mother has for him.  There is no doubt in my mind that if Adrian is not given the opportunity to have a relationship with his mother, and is allowed to believe that it is her choice not to see him, he will feel abandoned, hurt and have trust issues in the future."

In its report for the section 366.26 hearing, respondent recommended that Mother's parental rights be terminated and that adoption be selected as the permanent plan for the children.   Respondent noted that both boys had improved dramatically while living with their paternal grandparents.  Meanwhile, Mother's visitation schedule had been reduced from weekly overnight visits to four hours per week.  She then missed visits for four weeks after Mother's Day on May 11, 2014. The child welfare worker noted that Mother and the paternal grandparents "seem to have a great deal of conflict, likely arising from both sides."  She had referred the children and all of the adults to a counseling program, to "work with the children's individual emotional needs, but also work with the paternal grandparents and [Mother] to communicate effectively . . . ."

7

At the section 366.26 hearing, the CASA volunteers for both children testified that the children would be harmed if their relationship with Mother was severed. Adrian's CASA volunteer opined that Mother was not in a position to reunify with the children as their full-time custodial parent; she believed, however, they would benefit from regular visitation with Mother. Julian's CASA volunteer opined Mother would be capable of assuming full-time responsibility for the boys. The paternal grandmother made a statement, not under oath, in which she said the children would be allowed to see Mother if they were adopted by the paternal grandparents. Mother also made a statement in which she said that she loved her children and had made many sacrifices for them. The boys loved her and would be upset if she could not visit them. Mother believed she would not be allowed to do so if they were adopted.

After taking the matter under submission, the juvenile court followed respondent's recommendation. It terminated Mother's parental rights to Adrian and Julian and selected adoption as their permanent plan.

*Discussion*

Mother and the children contend the trial court erred when it declined to apply the "beneficial parental relationship" exception and select guardianship, rather than adoption, as the permanent plan. We are not persuaded.

Section 366.26 provides that if a parent has failed to reunify with an adoptable child, the juvenile court must terminate parent rights and select adoption as the permanent plan for the child. The juvenile court may select a different permanent plan, such as guardianship or long term foster care, only if it "finds a compelling reason for determining that termination would be detrimental to the child [because]: . . . [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. I(1)(B)(i).)

"To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.) A

8

beneficial relationship "is one that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

"Overcoming the statutory preference for adoption and avoiding the termination of parental rights requires the parent to show both that he or she has maintained regular visitation with the child and that the child would benefit from continuing the relationship. (§ 366.26, subd. I(1)(B)(i).) 'Sporadic visitation is insufficient to satisfy the first prong' of the exception. (*In re C.F.* (2001) 193 Cal.App.4th 549, 554.) Satisfying the second prong requires the parent to prove that 'severing the natural parent-child relationship would deprive the child of a *substantial, positive* emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466, 121 Cal.Rptr.2d 482.) Evidence that a parent has maintained ' "frequent and loving contact" is not sufficient to establish the existence of a beneficial parental relationship.' (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.)" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643, 117 Cal.Rptr.3d 318.)

Mother did not meet either prong of the beneficial parental relationship exception. First, she did not maintain regular visitation. During the review period between October 2012 and April 2013, Mother had weekly visitation but attended only once in December 2012, twice in January 2013 and once in March 2013. Although she was eventually offered a second weekly visit, she attended those visits only three times. Mother's attendance at visits became more regular as the case progressed, but she still cancelled weekend visits on December 28, 2013, January 10, 2014, January 18, 2014 and January 24, 2014. After Mother's reunification services were terminated in March 2014, Mother attended four hours of visits with the children each week during March, April and

9

the first two weeks of May. However, she did not see the children at all from May 11, 2014, until the June 25, 2014 hearing.

Second, substantial evidence supports the juvenile court's finding that Adrian and Julian would not be greatly harmed by the termination of Mother's parental rights. To satisfy this prong of the beneficial parental relationship exception, the parent must prove that "severing the natural parent-child relationship would deprive the child of a *substantial,* positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) A child is "greatly harmed" by severing the parental relationship only where that relationship promotes the child's well-being "to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

In this case, both children improved dramatically after being placed with their paternal grandparents. Adrian, for example, entered foster care with a diagnosis of autism. That diagnosis was revised after his placement with his grandparents. Now, Adrian no longer meets the autism criteria. Julian had also shown progress in his behavior, intellectual and emotional development and social skills.

Mother has succeeded in planning and carrying out many fun activities with the boys, but she has not provided them with the routine, stability and emotional security they need to flourish. Even after months of parenting classes, therapy and other reunification services, Mother complained that the boys did not listen to her or follow her directions. On at least one occasion, she had to call the paternal grandparents for help in getting the boys to leave a birthday party with her. In February 2014, Mother told respondent that she thought the boys should have in home therapy because they behaved differently at home than they did in the therapist's office. For example, Julian had temper tantrums at Mother's home but was well behaved during therapy. Mother reported that the boys were reluctant to leave her after an overnight or weekend visit, but the

10

grandparents reported that they separated easily from her, often forgetting to say goodbye to Mother or give her a hug at the end of a visit.

Substantial evidence shows that Adrian and Julian have an affectionate, generally positive relationship with Mother, but she has never given them the stability they require. It was only after their placement with the paternal grandparents that Adrian and Julian were able to develop age appropriate behaviors and social skills. Both boys have grown attached to their grandparents and have flourished in their care. They may suffer some detriment from the termination of Mother's parental rights, but they will gain far more from the safety and stability of a permanent adoptive home.

Substantial evidence supports the juvenile court's findings that Mother did not maintain regular visitation and that her relationship with the children is not so strong and emotionally significant to them that they would be greatly harmed by its termination. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316-1317.) Consequently, the juvenile court properly found there was no beneficial parental relationship sufficient to overcome the statutory preference for adoption.

*Conclusion*

The August 20, 2014 order terminating parental rights and selecting adoption as the permanent plan for both children is affirmed.

NOT TO BE PUBLISHED.


                                        YEGAN, J.
We concur:



        GILBERT, P.J.



        PERREN, J.


11

Denise de Bellefeuille, Judge

Superior Court County of Santa Barbara

_____

Nicole Williams for Nicole C., Appellant

Johanna R. Shargel, for Minor Appellants.

Michael C. Ghizzoni, County Counsel, County of Santa Barbara and Maria Salido Novatt, Sr., Deputy.